IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID A. DOWNS,<br>      Plaintiff<br><br> vs.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES; SOCIAL<br>SECURITY ADMINISTRATION,<br>      Defendants | Civil Action No. 09-1366<br>Chief Magistrate Judge Amy Reynolds Hay |

MEMORANDUM OPINION

HAY, Chief Magistrate Judge

Acting pursuant to 42 U.S.C. § 405(g), 1383(c)(3), David A. Downs ("Downs" or "the Claimant") appeals from a May 14, 2009 decision of the Commissioner denying his application for disability insurance and supplemental security income benefits. Cross Motions for Summary Judgment are pending. The Motion filed by Downs (ECF No.19 ) will be denied, and the Motion filed by the Commissioner (ECF No. 24) will be granted.

**I. BACKGROUND**

Downs, who was born in 1954 and holds a Bachelor of Science degree in Electrical Engineering, was employed for some twenty years as a senior information analyst at the Westinghouse Research Center in Churchill. (T. 26-27). In that capacity, he worked with computer programming and maintenance of computer systems - planning computer facilities, training staff, and implementing procedures having to do with computer operations. He took occasional business trips, and "gradually became responsible for making recommendations with regard to the hardware." (T. 27-28). On January 31, 1998, he was laid off due to corporate downsizing and, for purposes of this opinion, did not work again. (Id. at 28).

On April 13, 2007, Downs protectively filed an application for disability insurance benefits[1] and supplemental security income benefits, alleging that he became disabled on June 1, 1999, due to depression and anxiety disorder, severe allergy problems, and asthma. (T. 143). The claim was denied initially in a decision dated August 31, 2007. He then requested a hearing which took place in Latrobe, Pennsylvania on March 10, 2009. Downs, who was represented by counsel, testified, as did a vocational expert. On May 14, 2009, the Administrative Law Judge ("ALJ") issued a decision in which he found that the Claimant was not disabled. (T.8). A request for review was denied by the Appeals Council on August 27, 2009, making the ALJ's opinion the final decision of the Commissioner. This appeal followed.

II.     **STANDARD OF REVIEW**

The Social Security Act ("the Act") limits judicial review of the Commissioner's final decision regarding benefits to two issues: whether the factual findings are supported by substantial evidence, and whether the correct law was applied. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). "Where the ALJ's findings of fact are supported by substantial evidence, [the Court is] bound by those findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

III.    **THE ALJ'S OPINION**

The ALJ arrived at his finding that Downs was not disabled within the meaning of the Act by applying the sequential five step analysis articulated at 20 C.F.R. §§ 404.1520(a) and

---

[1] In order to establish eligibility for these benefits, Downs bears the burden of establishing that he became disabled on or before the date on which he was last insured, December 31, 2002. See 42 U.S.C. § 423(a), (c).

2

416.9020(a).[2] A claimant bears the burden of proof at the first four steps, and the Commissioner bears the burden at the fifth. See Fargnoli, 247 F.3d at 39. The ALJ resolved this matter at Step Five.

At Step One, the ALJ found that the Claimant had not engaged in substantial gainful activity since June 1, 1999. (T. 10). At Step Two, the ALJ concluded that the Plaintiff had "the following severe impairments: a major depressive disorder, recurrent, mild to moderate, an adjustment disorder with depressed mood, and a personality disorder." (Id.) He found at Step Three that none of these impairments met or was equivalent to any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (T.11). The ALJ considered the listed impairments falling within Listing 12.00, particularly the criteria for affective disorders listed at 12.04, and those for personality disorders listed at 12.08. (T.12). Focusing on the "paragraph B" criteria of the listings, the ALJ wrote:

> To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every four

---

[2]The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, he is not disabled; (2) If the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent him from doing his past relevant work, he is not disabled; (5) Even if the claimant's impairment or impairments prevent him from performing his past work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

months, each lasting for at least 2 weeks.

(Id.). The ALJ found that the evidence failed to show that Downs had any restriction in activities of daily living, or marked difficulties in social functioning, concentration, persistence, or pace. Furthermore, he had not experienced any extended episodes of decompensation. (Id.).

At Step Four, the ALJ concluded that Downs's severe limitations prevented him from returning to his past relevant work as a computer systems analyst. Downs's prior work, as it was actually performed, required heavy exertion, and was skilled. (T.17). Because "[t]he claimant is limited to no more than unskilled work by her [sic] impairments . . . [he] is unable to perform past relevant work." (T.16).

After reviewing the medical evidence and considering Downs's description of his symptoms and activities, the ALJ found that Downs's "subjective allegations [were] exaggerated and not fully credible." (T. 13). Based on his evaluation of the evidence as a whole, the ALJ found that the Downs had:

> the residual functional capacity to perform . . . work at all exertional levels, but with the following nonexertional limitations: the claimant can perform no more than simple, routine, low stress work (no deadlines or fast-paced production), and is limited to jobs that require no interaction with the public, no more than occasional interactions with co-workers and supervisors, and no teamwork.

(T. 13). Given this residual functional capacity, the vocational expert testified that Downs could perform work available in significant numbers in the national economy. (T. 54). As a result, the ALJ concluded that Downs was not disabled within the meaning of the Act. (T. 18).

## IV. DISCUSSION

### A. The Subjective Evidence of Pain

The Claimant raises three allegations of error. (T. 13). First, Downs contends that the ALJ failed to consider the subjective testimony and medical evidence regarding pain: "The ALJ does not mention pain in his analysis of the case," and "the Secretary must produce specific medical evidence to disprove the claimant['s] testimony as to pain[,] and his findings concerning the allegations of pain must be specific." (ECF No. 20 at 5). According to Downs, "[p]ain evidence is completely uncontradicted in the record developed by the ALJ." (Id.).

Downs argues that the ALJ's failure to address the evidence bearing on pain is particularly problematic given what he characterizes as the interrelationship between pain and his sleep-related issues. Downs contends that the record establishes that prescription pain relievers caused dizziness, vertigo, and sleepiness. "The sleep period to try to deal with the pain could take hours and no control is possessed by the [claimant] to keep the need from arising during work hours." (Id). This fact, says Downs, negates his ability to hold a job: "The vocational expert testified that an inability to keep on schedule at least ninety percent (90%) of the time would preclude all work." (Id.).

The Court has carefully reviewed the opinion of the ALJ and the remainder of the record in order to assess Down's first allegation of error: "Despite testimony about head pain associated with Plaintiff's anxiety disorder and reference to medication to treat this pain, that only partly does treat it, *and citation to chronic pain by treating doctors* the ALJ does not mention pain in his analysis of the case." (Id. at 45) (emphasis added). The Court finds it significant that in framing this argument, Downs himself does not list transcript or exhibit references documenting

5

that any medical source noted chronic pain of the type that he described for the ALJ at the hearing.

The hearing transcript memorializes the follow exchange between the ALJ and the claimant regarding pain-related complaints:

> Q      Do you have any physical manifestations that relate to your anxiety?
>
> A      Yes.
>
> Q      What are they?
>
> A      A pain that extends from here, you know, sort - -
>
> Q      By here you're talking about - -
>
> A      - -of a circular area - -
>
> Q      - -your forehead?
>
> A.     Actually it's a bit behind the forehead, above the temples. And it can extend back above the ears, back to midway behind the ears.
>
> Q      Okay.
>
> A      And that can get quite severe the pain from that --
>
> Q      well is this a headache or is it something else?
>
> A      It's not a normal headache. I mean it's all localized, and . . . it's definitely related to the stress.
>
> Q      Okay. And have you seen a doctor about this pain?
>
> A      Yes. That's why I got the medication.
>
> Q      And what medication are you getting for that pain?
>
> A      Well the Ativans. Now we've tried also Buspar. Buspar I ended up with severe dizziness and vertigo problems from it though. And

> with psychotropics that's not uncommon, I understand. But instead
> of getting diminished over time, it got worse and worse and worse
> until I was like that was impractical. Also took something else,
> what was it, Vistaril I believe is the name of it . . . .

(T. 41-42). The medical records - and the absence of medical records - relating to pain and the medications identified by Downs place this testimony in context.

Nowhere in his application for benefits does Downs mention pain, and he did not include pain medication on the list of drugs he was taking. (T. 142-169) Although Downs reported that he took Ativan, he noted that this drug was prescribed for anxiety. (T. 147). The claimant did not indicate that pain interfered with his ability to leave his house two to three times per week, drive a car, shop for food and household goods two to three times per week for up to one and one-half hours at a time, or his ability - at least on rare occasions - to collect stamps, read, enjoy sports, listen to music, take walks or hike, collect rocks and minerals, participate in fantasy baseball, and care for his guinea pigs. (T. 48, 156-57). The record also fails to show that Downs's ability to spend time talking, shopping, and working on cars with others "usually a few times a week" or to attend church on a sporadic basis was impeded by pain. (T. 157). The portions of the function questionnaire addressing pain and the effects of pain is blank. (T. 162).

The medical evidence documenting pain of any type is negligible. Downs was seen three times in the Emergency Department at Forbes Regional Medical Center. In October 2000, he suffered an injury to the third finger of his left hand, which was caused by a saw. (T. 219). On January 20, 2001, he was seen for a cut above his eye, which was sutured, and for pain in his jaw. (T. 209-10, 203-204). Both injuries were secondary to an assault. There were no fractures. Downs was told to take Advil, and apply ice packs to his eye and jaw. In July 2002, Downs

7

underwent a battery of tests related to complaints of chest pain. He denied headache or other pain, and signed out of the hospital against medical advice. (T. 187-199).

In October 2005, Downs saw his family physician, Alan Aspinall, M.D., for a muscle spasm in his right shoulder and neck that had begun a month before when he lifted a heavy object. No pain medication was prescribed, and Downs was directed to begin physical therapy. In August 2007, Downs told state examiner, Mehernosh Khan, M.D., that he experienced pain in his feet when he stood for extended periods. (T. 343). There is no record that he complained of pain again until May 2008, when he presented to Dr. Aspinall with discomfort in his neck, intermittent back pain, and pain in a toe that had been fractured ten years before. He also described "trouble standing for hours at a time." (T. 353). Downs did not, however, tie this pain to anxiety or stress, and Dr. Aspinall characterized it as "mild and intermittant [sic]." (Id.). X- rays of the neck, back, and foot were negative, and prescription painkillers were not required.

The record also fails to substantiate Downs's testimony that he was prescribed Ativan,[3] Buspar, or Vistaril for pain control, or that these medicines failed fully to alleviate his anxiety-related symptoms. The Ativan was prescribed for anxiety. (T.182). Downs does not cite and the Court has not located record evidence associating Ativan with complaints of pain or its use as a pain control measure. The record also fails to establish any relationship between Buspar or Vistaril and pain control. Instead, the record shows that Buspar and Vistaril were prescribed to replace Ativan as medication for anxiety. Downs received a DUI in 2006, and, as a result, was required to complete an alcohol education program. (T. 48-49). His August 28, 2008 treatment

---

[3]Throughout his brief, Downs refers to the drug "Ativaris." (See e.g., ECF No. 20 at 5). The record does not mention Ativaris, and the Court is unable to verify that a drug with this name exists. The Court assumes, therefore, that Downs intended to refer to Ativan.

notes show that the discontinuation of Ativan and the substitution of Buspar and Vistaril were unrelated to inadequate anxiety or pain control. Instead, the change was made in order to meet requirements of a diversion program associated with the DUI. (T. 372, 375, 376, 383).

A claimant's allegations alone will not establish that he is disabled. 20 C.F.R. § 404.1529(a). See also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir.1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence." (citing 20 C.F.R. § 404.1529)). "An ALJ may reject subjective complaints of pain if he does not find them credible, but he 'must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding.'" Garibay v. Comm'r of Soc. Sec. Admin., No. 08-4065, 2009 WL 2008445 at * 5 (3d Cir. July 31, 2009) (quoting Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999) ). See also 20 C.F.R. § 404.1529.

The ALJ's explanation for finding Down's symptom-related limitations - which is clearly how Downs's testimony characterized his pain - squares with this standard. [4] Thus, the Court does not find error in the ALJ's treatment of Downs's subjective complaints of anxiety related pain.

---

[4] In finding Downs's subjective allegations less than fully credible, the ALJ wrote:

> [T]he ALJ has carefully considered the claimant's subjective allegations of disabling symptoms in accordance with Social Security Regulations 404.1529 and 416.929, and Social Security 96-7P. However, when so considered, and when contrasted with the record as a whole, including the findings upon mental status examination and diagnostic study, the claimant's conservative course of medical treatment, the credible medical opinion evidence of record, the claimant's activities of daily living, and the claimant's appearance and demeanor at the hearing, his subjective allegations are found to be exaggerated . . . to the extent he alleges to be "disabled" by them.

(T. 12).

### 2.     The ALJ's Analysis of Downs's Sleep-Related Problems

Downs next argues that the ALJ, in evaluating the Claimant's affective disorders, "fail[ed] to understand that sleeping issues arise in conjunction with the conditions." (ECF No. 20 at 6).  This contention, like the prior argument challenging the ALJ's discussion of pain, disputes the ALJ's finding that Downs's subjective account of his sleep difficulties was not credible.  At the hearing, Downs characterized his sleep issues as side effects of medication - particularly Ativan - prescribed to deal with anxiety.  He stated that if he took enough Ativan, "the full milligram, then [he would] end up asleep . . . at some point within the next hour or two."  (T. 38).  He also testified that if he did not take the medication, he would be unable to concentrate sufficiently to perform a job.  (T. 41).  Later in the hearing, Downs described his sleep-related problems in greater detail: "It's rare that I sleep less than ten hours of, in fact ten hours is very little sleep for me 12 to 16 hours is much more common unless my anxiety level or something, in which case I have severe insomnia.  Without, I mean the Ativan will knock me out.  And when I'm up, I'm really up."  (T. 45).

Evaluating this testimony against the background of the other record evidence, the ALJ concluded that the record did not establish a sleep disorder that could be expected to cause the symptoms described by the claimant, nor did it establish that an excessive need for sleep was a side effect of Downs's anxiety medication: "Dr. Aspinwall [sic] has treated the claimant for some time with the medications Celexa and Lorazepam for his depression and anxiety, but does not report any significant adverse side effects from the use of the medications." (T.12).  Downs argues that this conclusion is at odds with "multiple medical reports and histories from July 18,

10

2007 to February 27, 2009."[5] The Court, therefore, turns to the record evidence generated from 2007 forward.

In May 2007, after his application for benefits was filed, Downs reported to staff at Excela Health, Westmoreland Regional Hospital ("Excela") that he had "some sleep difficulties," (T. 285), and that his sleep was "still [somewhat] erratic." (T. 384).

One month later, in a report detailing a clinical evaluation of the claimant, psychologist, Stephen Perconte, Ph.D., failed to note any report of side effects associated with Downs's medication. Downs did not report difficulty with falling asleep, sleep continuity, or other disturbance. (T. 313). Dr. Perconte did note that the claimant's sleep overall was "somewhat erratic and unpatterned." (Id.). Nonetheless, according to Dr. Perconte, the exam and testing "suggest[ed] at most mild overall impairment [in] the claimant's capacity to sustain attention to perform task[s] of any kind. His attention appear[ed] to be adequate, although his motivation [was] poor." (T. 315).

In July 2007, psychologist, Edward Zuckerman, Ph.D., made no mention of sleep or medication issues. He found that Downs was "able to maintain concentration and attention for extended periods of time," and "could sustain an ordinary routine without special supervision." (T. 324). At his counseling appointment the same month, Downs again failed to reference problems with sleep or medication side effects. (T. 383). The same was true in August 2007. (T. 382).

State agency medical examiner, Dr. Khan, in his report dated August 16, 2007, did not

---

[5] In framing this argument, the claimant appears to concede - and the Court's review of earlier records confirms - that he did not raise sleep related complaints, either as a sleep disorder or as a medication side effect, with any of his medical care providers prior to 2007.

11

note complaints relating to sleep or medication side effects. (T. 338). This was the case with staff reports regarding Downs's August and October 2007 counseling appointments. (T. 381). Downs saw his primary care physician in October 2007 and did not raise sleep or medication-related complaints. (T. 347 - 361). Records from Downs's February, April, May, and June counseling sessions do not mention sleep issues or medication side effects. (T. 374, 375 376, 378). At his appointment on August 28, 2008, Downs reported that he was "doing fine" but "would be better if he [was] still on Ativan." (T. 372). The law recognizes that an absence of evidence may be probative. See Burns v. Barnhart, 312 F.3d 113, 130-31 (3d Cir. 2002) (finding lack of complaints to treating physician regarding side effects of medication supported ALJ's finding that complaints were less than credible).

The last item in the record is a progress note from Downs's February 2009 counseling appointment which reads as follows. "Areas of distress include sleeping issues, problem [with] sticking to a schedule or routine that prohibits accomplishment of 'Big tasks or small tasks.' Wonders if [history] of multiple concussions has [unintelligible] ability to reason, plan and follow thru [sic]." (T. 386). Downs argues that these two sentences constitute a treating doctor's *"conclusion"* that sleeping issues and problems adhering to a schedule or routine "prohibit[ ]" Downs from accomplishing small and large tasks. (ECF No. 20 at 6). Downs then contends that the ALJ failed to understand that sleeping issues were associated with Downs's depression and anxiety. The Claimant makes this sweeping statement:

> The doctor understands this and uses that knowledge in arriving
> at his opinion. The sleep issue makes meeting a 90% of [sic] work
> time schedule not possible and thus the Vocational Expert's
> testimony that such an attendance [sic] is required to do substantial
> gainful activity supports the doctor's opinion.

(Id.). There are multiple problems with this statement. First, the February 2009 progress note does not constitute a treating professional's opinion or conclusion about anything. It simply records what Downs himself reported. Second, the note does not establish that the reported "sleeping issues" are associated with depression and anxiety or were side effects of Downs's medication. Third, it does not follow from the note that Down's task-related difficulties arise from problems with sleep. In fact, according to the note, *the claimant himself wondered whether these difficulties were associated with his history of concussions*. Fourth, it is impossible to draw from this treatment note that any sleep issue compromised the Claimant to the degree that he could not maintain a schedule ninety percent of the time. The treatment note - even when evaluated in conjunction with all of the other record evidence bearing on Downs's sleep issues - cannot bear the tremendous weight placed upon it, and is wholly insufficient to overcome the ALJ's analysis of those issues. As was the case in the context of Downs's subjective complaints of pain, the ALJ evaluated the evidence in accordance with governing regulations. He found first that Downs's medically determinable impairments could not reasonably be expected to produce the degree of restriction to which Downs testified. He also stated that, in any event, Downs's statements concerning intensity, persistence and limiting effects of his sleep problems were not entirely credible based on the other evidence of record. In making these findings, the ALJ relied, as he was entitled to do, "not only on what the record [said], but what it did not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). See also Lane v. Comm'r of Soc. Sec. Admin., No. 03-3667, 2004 WL 1217375, at *4 (3d Cir. June 3, 2004) (citing Dumas for proposition that "lack of medical evidence is very strong evidence that [claimant was not disabled").

       The mere fact that Downs may suffer from some type of sleep disturbance, whether it is

viewed as an independent disorder or as a side effect of medication, is not the equivalent of demonstrating that it is a severe impairment within the meaning of the Act. See Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990) (the disability inquiry does not end with the mere diagnosis of an impairment; rather a showing must be made that the impairment is severe and would preclude gainful activity). Downs has failed to make that showing. The Court is satisfied that the record amply supports the ALJ's treatment of Downs's sleep-related issues.

### 3. The ALJ's Findings With Respect to Downs's Asthma

Downs last challenges the ALJ's conclusions with respect to symptoms of asthma. The ALJ found that although the record established that Downs suffered from chronic asthma, it also established that the condition had been "adequately controlled with conservative medical treatment, from which the claimant exhibits no significant adverse side effects." (T. 10). In reaching this conclusion the ALJ looked first to the records of Downs's treating physicians, observing that while they documented a history of asthma treated with "medication like albuterol, . . . on physical examination, [they] almost always [found] the claimant's lungs clear to auscultation and percussion, with clear breath sounds. These doctors have treated the claimant from approximately July, 2002 into April, 2008 (Exhibits 1F, 3F, 12F)." (T. 11). The ALJ relied, too, on the August 2007 record of consultative physician, Dr. Khan, who found that the Claimant did not complain of shortness of breath, and that "his lungs were clear with good inspiration and expiration and no rhonchi or wheezing." (T. 339-40). Dr. Khan noted that Downs's regular use of Albuterol meant that "his control was not good." (T. 338). Downs was not using his Advair Diskus on a regular basis. (T. 340). Dr. Khan stated that Advair would reduce the need for Albuterol, which he described as a "rescue inhaler." (T. 340).

14

According to Dr. Khan, Downs was limited to six hours of standing in an eight hour day due to complaints of foot pain, and that he could lift ten pounds occasionally, and should avoid temperature extremes. (T. 343-44). No other limitations were noted. The ALJ gave "minimal weight" to the standing and lifting restrictions noted by Dr. Khan, noting that they were inconsistent with reports from Downs's treating physicians, and were "based purely upon the claimant's subjective allegations which . . . [were] not supported by the record as a whole." (T. 16).

Downs challenges the ALJ's findings in an argument that the Court finds to be virtually incomprehensible. Whether this is attributable merely to lax proofreading is unclear. In order to illustrate its difficulty, the Court recounts Downs's argument verbatim:

> When the ALJ noted the asthma was controlled he was looking to a non work situation when the doctor indicated no more than ten pounds could be lifted he was addressing the result on the asthma in a different situation then all the medical observations referred to by the ALJ addressed. The doctor looked to the limits of the medication to help and the ALJ has no evidence that the doctor's conclusion is incorrect. Insofar, as the Secretary/ALJ found the Plaintiff cannot do the full range of activities at any level and the medical evidence from the doctor is that the Plaintiff could not lift over ten pounds without adversely effecting his asthma which is controlled only in a non-exertional setting the regulations require benefits to be awarded as he is precluded from performing the full range of sedentary activity. 20 CFR CR 111 Pr. 404, Subpt. P App. 2 § 201.

(ECF No. 20 at 6).

Although the claimant does not reference the doctor's name, the Exhibit number, or the Transcript page in the course of his argument, it is apparent that he focuses on the report of Dr. Khan. (T. 339). This report was accurately summarized in the ALJ's opinion, as were his reasons for according it minimal weight. In challenging the ALJ's decision to accord greater

15

weight to the findings of the Claimant's treating physicians, Downs does not argue that the ALJ erred in finding that these physicians' reports, compiled over a significant amount of time and number of examinations were essentially negative with respect to limitations imposed by asthma, and therefore, were at odds with the findings of one-time examiner, Dr. Khan. Insofar as the Court is able to decipher the argument, it appears that Downs contends that the treating physicians failed to consider the limitations that could be imposed by asthma in a work-related situation. This argument is belied by the fact that Dr. Aspinall *did* address work-related limitations in concluding that Downs was disabled for state welfare agency purposes.[6] Even in that situation, the doctor did not find that asthma was a factor which prevented Downs from working. (See T. 236).

Where there is conflicting medical evidence, "the ALJ may choose whom to credit[,] but he 'cannot reject evidence for no reason or for the wrong reason.' " Plummer v. Apfel, 186 F.3d 422 , 429 (3d Cir.1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ "must consider all the evidence and give some reason for discounting [that which] she rejects." Id. This he did. The Court does not find error in the ALJ's analysis of Downs's chronic asthma.

## IV. CONCLUSION

Because the Court finds that the decision of the Commissioner is supported by substantial evidence and does not rest on a misapplication of the law, the Motion for Summary Judgment filed by the Commissioner (ECF No.19) will be granted, and the Motion for Summary Judgment

---

[6] A physician's finding of disability for purposes of a state program is not binding on the Commissioner. See 20 C.F.R. §416.927(e)(1).

filed by the Claimant (ECF No. 24 ) will be denied.  Appropriate Orders follow.

By the Court,

/s/*Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated:   12 October, 2010


cc:      All counsel of record by Notice of Electronic Filing